# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
    Samsung Galaxy S9 Smart Phone, )
    IMEI: 352190070694343 )
 )

Case No.

**19MJ2244**

FILED

MAY 30 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (incorporated herein)

located in the    Southern    District of    California   , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
   ☑ evidence of a crime;
   ☑ contraband, fruits of crime, or other items illegally possessed;
   ☑ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8 U.S.C § 1324(a)(l)(A)(ii) and (v)(l) | Conspiracy to Transport Illegal Aliens |

The application is based on these facts:
See attached affidavit of Border Patrol Agent Esteban Limon

   ☑ Continued on the attached sheet.
   ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Esteban Limon, Border Patrol Agent
*Printed name and title*

Sworn to before one and signed in my presence.

Date: 5/30/19

*Judge's signature*

Bernard Skomal
Hon. Ruben B. Brooks, United States Magistrate Judge
*Printed name and title*

City and state: San Diego, California

# AFFIDAVIT

I, Esteban Limon, being duly sworn, declare and state:

## INTRODUCTION

1. This affidavit supports an application to search the following target property:

    a. Black Samsung Galaxy S9 Smart Phone, IMEI: 358215090152788 (**Target Telephone 1**), as more particularly described in Attachment A; and

    b. White Samsung Galaxy S9 Smart Phone, IMEI: 352190070694343 (**Target Telephone 2**), as more particularly described in Attachment A; collectively referred to as the **Target Telephones**.

2. **Target Telephone 1** was seized from Arturo VILLAFRANCO and **Target Telephone 2** was seized from Edgar Velasco, GONZALEZ on April 15 2019, when they were arrested for violation of Title 8 U.S.C. § 1324 (a)(1)(A)(ii) - Transportation of Certain Aliens for Financial Gain. Probable cause exists to believe that the **Target Telephones** contain evidence relating violations of Title 8 U.S.C. § 1324 (a)(l )(A)(ii) and (v)(I), Conspiracy to Transport Illegal Aliens.  Probable cause exists to believe that the **Target Telephones** contain evidence of a crime and property designed for use, intended for use, or used in committing a crime.  Specifically, I have probable cause to believe VILLAFRANCO and GONZALEZ used **Target Telephone 1 & Target Telephone 2** to communicate with co-conspirators during the alien smuggling event. Probable cause exists to believe that the **Target Telephones** contain evidence relating to violations of Title 8 USC §1324(a)(l )(A)(ii) and Title 8 U.S.C. § 1324 (a)(l )(A)(ii) and (v)(I), Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens.

3. The **Target Telephones** are currently in the possession of the Chula Vista Border Patrol Station at 311 Athey Avenue, San Ysidro CA 92173.

4. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized set forth in Attachment B (incorporated herein), may be or lead to: (1) evidence of the existence of alien smuggling or conspiracy

1

to transport illegal aliens in violation of Title 8 U.S.C. § 1324 (a)(1)(A)(ii) and (v)(I), Conspiracy to Transport Illegal Aliens; (2) contraband, fruits of crime, or things otherwise criminally possessed; and (3) property designed or intended for use, or which is or has been used as a means of committing criminal offenses.

## **EXPERIENCE AND TRAINING**

5. I am a Border Patrol Agent - Intelligence ("BPAI") with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal agent with the USBP since 2008, having graduated from the USBP Basic Border Patrol Training Academy. The 19-week academy curriculum covered basic police tactics and specialized training in the Immigration and Naturalization Act ("INA"), criminal law, statutory authority, as well as cross training in Title 21 United States Code, Controlled Substance Act ("CSA") violations and cross training in Title 19 United States Code, customs law violations.

6. I have been trained in investigating various violations of federal and state law, including but not limited to, alien smuggling, drug smuggling/trafficking, weapons smuggling, document and benefit fraud, identity theft, and bulk currency smuggling. I have worked with and learned from other agents and criminal investigators with extensive experience conducting these and other investigations as well. My past duties with the USBP included patrolling the United States/Mexico International Border to prevent the illegal entry of aliens, the illegal importation or exportation of illicit contraband to and from the United States, and to arrest those who are in violation of immigration laws or any other applicable federal or state laws.

7. I am currently a BPAI assigned to the Chula Vista Border Patrol Station. As a BPAI, I regularly engage in observation, surveillance, searches, records analysis, apprehensions, criminal and administrative evidentiary seizures, and the preparation of criminal and administrative cases for prosecution. I regularly conduct interviews of suspects and witnesses to support criminal and administrative charges. Through my

training and experience, I have gained a working knowledge of the structure and operations of criminal organizations.

8. Through the course of my career, through training, investigations, and conversations with other law enforcement personnel, I have become aware that it is a common practice for drug and alien smugglers to work in concert with other individuals and to do so by using cellular telephones, pagers and portable radios to maintain communications with co-conspirators to further their criminal activities. This is the case for any organization involved in the smuggling, trafficking, movement or distribution of illicit commodities, whether they be human cargo, controlled substances or other goods. Typically, organizations smuggling across the border, or to the interior from the border, are in telephonic contact with co-conspirators immediately prior to, during and following the smuggling event. These communications typically consist of instructions on how/where to cross or pick up contraband, directions of travel, and locations for delivery to stash houses and/or sponsors.

9. Human smugglers and their organizations use cellular and digital telephones, in part, because these individuals believe law enforcement is unable to track the origination and destination phone numbers of calls placed to and from cellular and digital telephones. Through the course of my career, I have arrested and interviewed numerous drug and human smugglers. Through these experiences, I have become familiar with the activities of those who coordinate trafficking events and the practices used for the drivers/smugglers they employ locally, including transportation methods and tactics used to communicate with the drivers and to avoid detection by law enforcement officers.

10. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of alien smuggling investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

11. Based upon my training and experience as a BPAI, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, email, web, social networking websites, and voice messages.

    b. Alien smugglers believe that cellular telephones provide greater insulation and protection against court-ordered wiretaps, and they believe in the inability of law enforcement personnel to simultaneously track the originating and destination telephone numbers of calls placed to and from their cellular telephones.

    c. Alien smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    d. Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations, so as to facilitate the further distribution of their illegal cargo inside the United States.

    e. Alien smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    f. Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity including the presence and location of marked and unmarked units, as well as the operational status of U.S. Border Patrol checkpoints within the United States.

    g. Smuggled aliens will use their cellular telephones to coordinate their smuggling arrangements and the phones will often contain phone numbers of individuals involved in the smuggling event.

## FACTS SUPPORTING PROBABLE CAUSE

12. On April 15, 2019, Border Patrol Agents David Chavez and Manuel Menocal were performing their assigned duties as part of a two agent team in the Chula

4

Vista Border Patrol Station's Area of Responsibility (CHU AOR). At approximately 9:00 a.m., Agents Chavez and Menocal were traveling westbound on Otay Lakes Rd. in a marked United States Border Patrol vehicle, equipped with fully functioning emergency equipment, to include lights and siren, when Agent Chavez, sitting in the passenger seat, observed a black vehicle (**Target Vehicle**), stopped in the eastbound lane of Otay Lakes Road in an area commonly known to Border Patrol Agents as "The Gravel Pit." Prior to observing the **Target Vehicle**, the Agents were aware of reports of possible illegal aliens in the area.

13. Otay Lakes Road is a two lane road with limited road-shoulder area and limited areas for a vehicle to safely pull over on the roadside without obstructing traffic. Additionally, there are no sidewalks to accommodate pedestrian traffic on this portion of the road. Otay Lakes Road runs through the Eastlake area of Chula Vista, California to the west and is bordered by State Route (SR) 94 to the east. This area, commonly known to Border Patrol Agents as "The Lakes," is commonly used by illegal aliens to further their illegal entry into the United States and is commonly used by Alien Smuggling Organizations (ASOs) to arrange for their illegal alien cargo or "load," to be picked up, by load drivers and vehicles.

14. This area of Otay Lakes Road is bordered by Otay Mountain to the southeast and undeveloped wilderness area to the northwest and contains multiple areas of dense brush, trees, and high grass that can be utilized by groups of illegal aliens as concealment. The terrain bordering both sides of Otay Lakes Road also makes it difficult for Agents to set up static surveillance positions and monitor the traffic in the area in order to detect load vehicles entering or exiting the area. Otay Lakes Road, being a narrow two-lane road with limited pull-out areas and limited road-shoulder, can only be patrolled by driving either westbound or eastbound until a safe place to turn around can be reached. This limits the ability of Border Patrol Agents to maintain a presence on Otay Lakes Road and provides the ASOs and their load drivers large windows of time to load their illegal alien cargo and exit the area. Otay Lakes Rd.

provides two egress routes that enable load drivers to quickly exit the area and blend into legitimate traffic.

15. Load vehicles can travel westbound into the heavily populated Eastlake area of Chula Vista and quickly access SR-125 or Interstate (I) 805 while blending into the surrounding legitimate traffic in the area. Conversely, the load vehicles can travel eastbound and continue onto westbound SR-94, already being west of the Brown Field Border Patrol Station's SR-94 Checkpoint, and blend in with legitimate traffic on this heavily utilized highway eventually gaining access to the heavily populated area of Jamacha Junction and the Rancho San Diego area, continuing west on SR-94 and easily accessing all major freeways in San Diego County.

16. As Agents Chavez and Menocal observed the **Target Vehicle** on the eastbound lane at The Gravel Pit, Agent Chavez noticed that the rear passenger side door was open, and observed two suspected illegal aliens hurriedly enter the **Target Vehicle** through the open door. The **Target Vehicle**, later identified as a black 2010 Honda Civic bearing California license plate 8GUX748, began driving eastbound with its hazard lights on. Agent Chavez instructed Agent Menocal to turn around and follow the black Honda Civic. Agent Chavez contacted the San Diego Sector Tactical Communications Center (SDC TCC), via Department radio, and requested records checks on the **Target Vehicle**. The SDC TCC informed Agents Chavez and Menocal that the **Target Vehicle** was registered to Edgar Velasco GONZALEZ and was not reported stolen. While following the **Target Vehicle**, Agent Chavez observed the silhouettes of at least five individuals through the rear windshield. Agents observed the vehicle continue to travel eastbound with its hazard lights on at a speed of approximately 40 miles per hour.

17. At approximately 9:05 a.m., Agent Chavez informed the SDC TCC, via Department radio, that he and Agent Menocal were attempting a two-Agent vehicle stop on the black Honda Civic. Agent Chavez directed Agent Menocal to activate the emergency lights and siren in an attempt to pull the vehicle over for further

investigation. The vehicle immediately pulled over into the parking lot of the Coyote Canyon Café at the Pio Pico RV Resort and Campground at 14615 Otay Lakes Rd., Jamul, California 91935. This area is approximately five miles east of the Otay Mesa, California Port of Entry and approximately six miles north of the primary border fence marking the international boundary between Mexico and the United States.

18. The driver, later identified as Arturo VILLAFRANCO, exited the **Target Vehicle** with his hands raised. When he exited the vehicle, VILLAFRANCO stated that the three individuals in the back seat of the car had flagged him down and were in distress.

19. Agent Menocal escorted VILLAFRANCO to the front of the **Target Vehicle**, while Agent Chavez approached **Target Vehicle** from the passenger side. Agent Chavez identified himself as a United States Border Patrol Agent and instructed the front seat passenger to remove the keys from the ignition and place the keys on the roof of the car. The front seat passenger, later identified as Edgar Velasco GONZALEZ, complied with Agent Chavez' commands and Agent Chavez removed him from the vehicle and placed him in front of the **Target Vehicle** where Agent Menocal could monitor VILLAFRANCO and GONZALEZ while Agent Chavez returned to the vehicle and question the three individuals in the back passenger area.

20. Agent Chavez again identified himself as a United States Border Patrol Agent in both the English and Spanish languages and commanded the three individuals to keep their hands in plain sight. The three individuals, later identified as Nathan HERNANDEZ-Diaz, Cristobal ROJAS-Ruiz and Miguel VIVIAN-Juarez, complied and Agent Chavez conducted an immigration inspection on each individual separately. HERNANDEZ, ROJAS, and VIVIAN all claimed to be citizens and nationals of Mexico without any legal documentation that would allow them to enter or remain in the United States legally.

21. At approximately 9:07 a.m., Agent Chavez placed HERNANDEZ, ROJAS, and VIVIAN under arrest. The three illegal aliens did not appear to be in any

7

type of distress at the time of their arrest. Agent Chavez informed Agent Menocal that the three individuals in the rear passenger area were illegally present in the United States and Agent Menocal assisted Agent Chavez with removing them from the **Target Vehicle**. At approximately 9:10 a.m., Agent Chavez placed VILLAFRANCO and GONZALEZ under arrest for violation of Title 8 U.S.C. § 1324 (a)(1)(A)(ii) - Transportation of Certain Aliens for Financial Gain. VILLAFRANCO, GONZALEZ, HERNANDEZ, ROJAS, and VIVIAN were transported to the Chula Vista Border Patrol Station for further processing.

22. During a search incident to the arrest of VILLAFRANCO and GONZALEZ, agent Chavez located **Target Telephone 1** on the center console. **Target Telephone 1** belonged to VILLAFRANCO. Agent Chavez retrieved **Target Telephone 2** from GONZALEZ.

23. At approximately 2:57 p.m., Agent Hurtado provided VIVIAN with his consulate communication rights in the Spanish language. VIVIAN stated that he understood his rights and declined to speak to the Mexican Consulate.

24. VIVIAN stated that his true and correct name is Miguel Angel VIVIAN-Juarez, who was born on May 30, 1993 in Tijuana, Baja California, Mexico. VIVIAN stated that he is a citizen and/or national of Mexico not in possession of legal immigration documents that would allow him to enter or be in the United States legally.

25. VIVIAN claimed that this was his third apprehension for illegally entering the United States by the United States Border Patrol. Agent Hurtado mentioned to VIVIAN that he had been previously documented as a foot guide during his previous arrests according to his immigration history. VIVIAN agreed and stated that the documentation was accurate. VIVIAN stated that he was traveling to San Diego, California to find work.

26. VIVIAN stated he illegally entered into the United States on Saturday, April 13, 2019, at approximately 3:00 pm, by climbing over the United States/Mexico international boundary near Tecate, Mexico. Agent Hurtado asked VIVIAN if he had

illegally crossed into the United States with the two other individuals [HERNANDEZ / ROJAS]. VIVIAN confirmed they all entered together. VIVIAN stated he knew he was entering the United States illegally during his time of entry.

27. Agent Hurtado told VIVIAN that he knew he was operating as a foot guide during this event. VIVIAN agreed. When asked about the events leading up to his arrest for the instant offense, VIVIAN claimed that he had made an agreement with HERNANDEZ and ROJAS to help them illegally enter the United States and guide them through the mountains in exchange for a job position that was offered by them, via their family, in San Diego. Agent Hurtado questioned VIVIAN as to the job title or type of employment that that he was offered and he stated that he did not know. Agent Hurtado asked VIVIAN if he was receiving any type of monetary compensation in addition for guiding HERNANDEZ and ROJAS. VIVIAN denied receiving any monetary compensation.

28. Agent Hurtado asked VIVIAN if he had a personal cellular phone and he claimed that he did not own one. VIVIAN stated that HERNANDEZ had a cellular phone and was receiving phone calls from the Mexico based smuggler. VIVIAN stated that HERNANDEZ was passing him the information that he received from the smuggler. Agent Hurtado asked VIVIAN if they communicated, via cellular phone, with the person and/or people who picked them up and he stated, "Yes." In addition, Agent Hurtado questioned VIVIAN as to how he knew what color vehicle or which vehicle was picking them up. VIVIAN claimed that he did not know the color or description of the vehicle, but was informed by the Mexico based smuggler that the load driver would call out his first name upon arrival at their location. VIVIAN stated that when the vehicle arrived he heard the driver say, "Miguel" in a high pitched voice. VIVIAN stated that when he, HERNANDEZ, and ROJAS ran towards the vehicle he noticed that it was a black, four-door, Honda. VIVIAN stated that he entered into the rear passenger compartment along with HERNANDEZ and ROJAS.

9

29. Agent Hurtado asked VIVIAN if the driver or front passenger spoke to them prior to getting stopped by the Border Patrol. VIVIAN stated that the passenger [GONZALEZ] instructed him, HERNANDEZ, and ROJAS, in the Spanish language, to tell the Border Patrol Agents that they needed help and had waved at the car for a ride.

30. Agents showed VIVIAN a six pack photographic line-up labeled "B1" containing six photos labeled one through six. VIVIAN identified photograph number "2" as the male who was possibly driving the black vehicle that picked them up. VIVIAN added that subject number "2" was also the individual who had instructed them to provide the Border Patrol Agents a misleading statement. Photograph number "2" is a depiction of Edgar Velasco GONZALEZ.

31. VIVIAN was shown a six pack photographic line-up labeled "A1" containing six photos labeled one through six. VIVIAN claimed that he could not identify any of the individuals depicted in the photograph line-up.

32. After the interview concluded, VIVIAN stated, in utterance, that he had to return to Mexico immediately. VIVIAN claimed that he needed to report to authorities in Tijuana for previously being arrested while driving a stolen vehicle in Mexico. Agent Hurtado told VIVIAN that his involvement in an alien smuggling event in the United States was yet another issue on his plate. Agent Calderon told VIVIAN that his need to return to Mexico immediately was contradictory of his previous statement where he expressed the desire to work in San Diego. VIVIAN admitted that he was being paid $1,000.00 (USD) each by the families of HERNANDEZ and ROJAS to illegally guide them into the United States.

## Methodology

33. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can

10

be simple cellular telephones and text messaging devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

34. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

35. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

36. Following the issuance of this warrant, I will collect the subject cellular telephones and, with assistance if necessary from cellular telephone forensic examiners,

11

will attempt to securely power the device, identify whether it is protected by a personal identification number (PIN), determine or circumvent the PIN and image or retrieve data subject to seizure pursuant to this warrant from the device. The search of the device or of an image on the data on the device will be limited to identifying and seizing data subject to seizure pursuant to this warrant and, in any event, will be limited to only the information to be found on basic cellular telephones: digital, cellular, and/or telephone numbers and/or direct connect numbers assigned to the device; call and direct connect history information; list of contacts stored on the device; text messages stored on the device; and, if equipped as a camera, photographs and videos stored on the device. In the event that I or other personnel lawfully conducting the analysis identify information pertaining to crimes outside the scope of this warrant, such information will not be used in any way unless a new warrant is obtained to search for such information.

37. I, or any other duly authorized federal agent, will personally serve the warrant requested above, and will be assisted by other duly authorized federal investigators.

## **CONCLUSION**

38. Based on the facts presented above, including (1) VIVIAN, a documented foot guide's admission that he was being paid to smuggle HERNANDEZ and ROJAS into the United States; and (2) VIVIAN's summary of the communication by telephone between the three aliens, the event coordinators, and the driver of the **Target Vehicle,** probable cause exists to conclude that Arturo VILLAFRANCO and Edgar Velasco GONZALEZ used the **Target Telephones** to facilitate human smuggling:. Because alien smuggling events take time to coordinate, the **Target Telephones** were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence, fruits of the crime, and instrumentalities for violations of Title 8, United States Code, Section § 1324, for the month prior to the smuggling event, between March 15, 2019 and April 15, 2019. I further believe that probable cause exists to believe that evidence, fruits of the crime and instrumentalities of illegal activity, committed by Arturo

12

VILLAFRANCO and Edgar Velasco GONZALEZ, continues to exist on the **Target Telephones**.

      39.   It is respectfully requested that this Court issue a warrant authorizing members of the United States Border Patrol or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to search the **Target Telephones** and seize evidence found therein.

      I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Esteban Limon
Border Patrol Agent (Intelligence)
U.S. Border Patrol

Subscribed and sworn to before me this 30 day of May 2019.

_____
HONORABLE ~~RUBEN B. BROOKS~~
UNITED STATES MAGISTRATE JUDGE
Bernard Skomal

13

*Search Warrant*
*Attachment A*
*Target Telephone 2*

# ATTACHMENT A

## PROPERTY/ITEMS TO BE SEARCHED

The item/property to be searched is described as:

    Samsung Galaxy S9 Smart Phone,

    IMEI: 352190070694343

    **(Target Telephone 2)**

which is currently in the possession of the Chula Vista Border Patrol Station at 311 Athey Avenue, San Ysidro CA, 92173

*Search Warrant*
*Attachment B*
*Target Telephone 2*

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search **Target Telephone 2** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Subject. The seizure and search of **Target Telephone 2** will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from **Target Telephone 2** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of **March 15, 2019** to **April 15, 2019**:

1. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a. tending to indicate efforts to smuggle illegal aliens into the United States from Mexico;

    b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to transport illegal aliens in the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in efforts to transport illegal aliens in the United States;

    d. tending to identify travel to or presence at locations involved in efforts to transport illegal aliens through the United States;

    e. tending to identify the user of, or persons with control over or access to, **Target Telephone 2**; or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above:

**which are evidence of violations of Title 8 U.S.C § 1324(a)(1 )(A)(ii), and Title 8 U.S.C § 1324(a)(1 )(A)(ii) and (v)(I), Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens.**

The seizure and search of the cellular phone(s) shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phone(s) may be searched for the evidence above.